## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **WESLEY S. WILLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **8:07CV3144** |
| **vs.** | ) | |
| | ) | **MEMORANDUM** |
| **MICHAEL J. ASTRUE,** | ) | **AND ORDER** |
| | ) | |
| **Defendant.** | ) | |

Plaintiff, Wesley S. Willey, seeks review of a decision by the Commissioner of the Social Security Administration (SSA), denying his applications for disability insurance benefits and supplemental security income benefits.

After carefully reviewing the administrative record and the parties' written arguments, the court concludes that the SSA decision should be affirmed.

## I.  PROCEDURAL BACKGROUND

This suit involves two applications made by the Plaintiff on January 9, 2004 pursuant to the Social Security Act:  (1) an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 *et seq.* and (2) an application for supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq*.

Both applications were denied initially and after reconsideration.  After a hearing, an administrative law judge (ALJ) issued a decision on August 23, 2006, in which she found the plaintiff was not disabled, as defined in the Social Security Act and was not eligible to receive Social Security disability benefits.  On April 14, 2006, the Appeals Council of the SSA denied

plaintiff's request for review, and the decision of the ALJ stands as the final decision of the Commissioner.

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II.  Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review to the same extent as the Commissioner's final determination under section 205.

Plaintiff filed this action on June 5, 2007.

## II.  FACTUAL BACKGROUND

The administrative record shows the following.

Plaintiff was born August 22, 1966.  He obtained a high school diploma in 1999.  He is married and has two teen-aged children.  Between 1985 and 2001, plaintiff worked as a school custodian; assembling and delivering furniture; fabricating steel; maintenance worker at a casino; bacon press operator; auto mechanic; exterminator; and self employed office cleaner.  He was employed seasonally at a grain elevator.

In November 1999 plaintiff began working as a welder for Exmark Manufacturing Co. in Beatrice, Nebraska, earning an average weekly wage of $514.26, or $12.86 per hour.  Plaintiff alleges that he became unable to work because of a disabling condition on February 21, 2001.[1]

---

[1]Plaintiff's original applications for benefits alleged that the onset of disability occurred October 1, 2001. Plaintiff subsequently requested, and the SSA district office recommended, that the disability onset be changed to February 21, 2001, the date of his first surgery.  (Tr. 93, 117, 396-97).

-2-

In August 2000, plaintiff experienced tingling and numbness in his hands.  In January 2001, his primary care physician, Dr. Terry Symonds, prescribed Vioxx and recommended electromyography (EMG) and nerve conduction studies of both hands.  Plaintiff was referred to Dr. Stuart G. Oxford.  After testing and examination on or about January 23, 2001, Dr. Oxford concluded that plaintiff's symptoms were compatible with "early moderate degree" bilateral carpal tunnel syndrome, approximately equal in both hands, with the left hand being more symptomatic at the time.

On February 9, 2001, plaintiff was evaluated by Dr. Richard Brennan, at which time an MRI showed bilateral carpal tunnel syndrome.  Surgery was performed on the left hand on February 21, 2001.  When he returned to Dr. Brennan on March 16, 2001, plaintiff showed considerable improvement (although he had numbness in the tip of his fifth finger) and  wanted to proceed with a carpal tunnel release on the right hand.

Plaintiff consulted Dr. Bruce Miller, an orthopedic surgeon, on April 13, 2001, reporting problems with the left hand and numbness in the right hand.  Dr. Miller recommended physical therapy for the left hand due to marked weakness in grip strength and limited motion.  Dr. Miller performed carpal tunnel release surgery on plaintiff's right hand on April 27, 2001.  At the time of his followup visit on May 4, 2001, plaintiff had seen improvement in the sensation in his right hand, although he continued to have problems with his left hand.  Plaintiff complained he continued to have numbness along the ulnar nerve in the left hand and tenderness at the site of the incision.  Dr. Miller recommended physical therapy.

-3-

Plaintiff consulted physical therapist John Sheeran on or about May 10, 2001. At his initial evaluation, plaintiff reported problems with strength in the left hand; the right hand was improving faster. Sheeran's report noted, "Grip strength best effort 45 pounds on the right, 50 on the left. Patient can finger oppose adequately. He does indicate that he has a tingling sensation in the pad of the right thumb, but this is diminishing." A three-week physical therapy plan was prescribed.

The June 4, 2001 report of physical therapist Jennifer Hutfles indicates that plaintiff returned to work on May 29, 2001, but left after five hours. He reported increased swelling in his right wrist, pain associated with activity, and decreasing grip strength. Testing showed "grip strength is right 50 lbs and left 50 lbs." He reported swelling along the wright wrist area and complained of pain along the thumb bilaterally. Plaintiff said he had complied with his home exercise program. Ms. Hutfles assessed "increased edema with decreasing range of motion for wrist extension and also decreasing grip strength." She prescribed a four-week period of physical therapy with a short term goal of increasing grip strength to 70 pounds, increasing extension bilaterally to 80 pounds, and resolving the edema. The long term goal was to achieve a functional range of motion strength to allow plaintiff to return to welding activities.

After his surgery plaintiff's duties at Exmark were restricted to light duty, indefinitely, and he was assigned to sweep floors three hours a day, five days a week. Plaintiff, who was commuting from Falls City to Beatrice, believed it would cost him more to drive to work than what he would earn at Exmark. Therefore, he would often call in to his employer stating that he was unable to make it to work. He last showed up for work at Exmark in August 2001.

-4-

Information provided by Exmark to the Social Security Administration indicates that plaintiff's employment was officially terminated in October 2001 for "job abandonment."

On June 22, 2001, plaintiff followed up with Dr. Miller reporting weakness in his hands and tenderness about the incisions. Dr. Miller determined that plaintiff had received the maximum benefit he could get from physical therapy. He could not return to work as a welder and would need to seek lighter work. (Tr. 326).

After an office visit on August 3, 2001, Dr. Miller opined that plaintiff had reached maximum medical improvement, noting that plaintiff's complaints were mostly subjective. (Tr. 325). He assigned restrictions of light to medium work with occasional repetitive grasping, pinching, and pushing and pulling with both upper extremities. He also recommended a Functional Capacity Evaluation (FCE) to measure plaintiff's restrictions and accurate assessment of his impairment.

Plaintiff's initial FCE was performed on August 23, 2001 at Lincoln Orthopedic Physical Therapy. (*See* Tr. 315-322). At the time of the examination, plaintiff was still on light duty at Exmark. The evaluating therapist, Jake DeNell, concluded that plaintiff had good hand strength, but he complained of pain. After testing, Mr. DeNell assigned a classification for medium-level work, which involved lifting up to 50 pounds. Plaintiff was not given any restriction in sitting, standing, walking, bending, reaching, climbing, squatting, kneeling, crouching, or stooping, and those tasks could be performed on a constant basis. He could perform simple grasping, but the therapist recommended that he perform tasks in a "neutral" position, i.e., within 20 inches of his body. He could do fine work "frequently" as long it was in a neutral position.

Mr. DeNell estimated that the complaints of wrist pain meant that plaintiff had total impairment of approximately 10%. In reaching this conclusion, DeNell noted that plaintiff had passed 43 of the 46 validity criteria during the FCE and showed good motivation during the testing. His movement patterns did not improve with distraction. His pain was in proportion to his movement patterns, and there were no indications of any abnormal or inappropriate pain behaviors.

Mr. DeNell concluded his report with the comment that even though plaintiff had a relatively small medical impairment, he had significant restrictions and disabilities. He was unable to lift in the medium/heavy, heavy, or very heavy categories of work and did not qualify for all work in the sedentary to medium work categories. He could not lift on a constant basis, his arms must be kept in a neutral position, and he had diminished capacity to perform repetitive motion tasks. He could not return to his welding job because of the amount of gripping required and the awkward positions his hands must be in. He was not able to perform jobs such as driving a truck because of the long gripping required of the steering wheel.

By letter dated September 20, 2001 (Tr. 323), Dr. Miller advised Exmark's workers compensation insurance carrier that plaintiff had a 10% permanent partial impairment in both the right and left upper extremities for a total impairment of 20%. Dr. Miller noted that the actual impairment was more than the 5% assigned by the physical therapist, as plaintiff was restricted from being able to return to his previous position as a welder. According to Dr. Miller, the FCE was accurate and plaintiff should comply with the recommendations made in the FCE.

An orthopedist, Thomas Ferlic, M.D., examined plaintiff in June 2002. He noted plaintiff's complaints of pain returning after his carpal tunnel syndrome surgery, but after an examination, was unsure of the etiology of plaintiff's complaints. He detected no atrophy or weakness. "It would appear that he had significant releases of both carpal canals since his symptoms actually went away for several months. Recurrence would be extremely unusual." (Tr. 338).

Plaintiff was referred to Stricklett & Associates for vocational rehabilitation services after he applied for Workers Compensation benefits. His initial evaluation took place on June 26, 2002. Vocational consultant, Tori Stratman, met with plaintiff, reviewed plaintiff's work history and medical records, and found the following positions to be appropriate: Sales Associate, Customer Service Representative, Sales Clerk (certain settings) and Security Guard. She found plaintiff to be a candidate for vocational rehabilitation services and advised him that a period of formalized retraining would be the most appropriate form of vocational rehabilitation to consider. Plaintiff told Ms. Stratman he wanted to discuss it with his wife and family.

Meanwhile, Dr. Symonds referred plaintiff to a neurologist, Dr. John M. Bertoni, who performed an examination on May 1, 2002. Dr. Bertoni noted, "His two problems are carpal tunnel syndromes and shakiness." Plaintiff reported that it affected the thumb, index and middle fingers; it was worse when he worked, drove, or relaxed; it was difficult to grip something or push something with his hands. He reported pain in both wrists, and the pain was worse if working or driving, but better if he relaxed.

Dr. Bertoni's report states that an EMG taken April 16, 2002 was "totally normal." Plaintiff did not appear to have any carpal tunnel syndrome and did not have any denervation. Plaintiff told Dr. Bertoni the two surgeries did not help his symptoms at all.  The shakiness in his hands had started five or more years ago, and he had a family history of tremors.  Plaintiff complained of some migratory chest pain with "hot flashes," and reported forgetfulness, depression, headache and dizziness.  The *opponens pollicis* was normal bilaterally, "although he has some give-away weakness he says because it hurts."  His cranial nerves were normal, his mental status was good and his muscle strength and tone all scored 5/5.  Dr. Bertoni observed no Babinski signs.  Tinel's sign at the wrist was "questionably positive" with a tingling toward his index finger.

Dr. Bertoni noted that plaintiff did not take medicines and had no allergies.  He appeared to be somewhat depressed, but compensated well, and his wife was quite supportive.  The doctor's diagnostic impression was (1) apparent history of carpal tunnel syndrome, post repair, with poor subjective results; (2) ongoing tingling and discomfort for which plaintiff "is not interested in taking any pain medications at all"; and (3) essential or familial tremor.  Dr. Bertoni advised plaintiff to "get on a program in which he finds some peace with his symptoms and problems.  [He] should take it upon himself to get on a program that will increase his abilities and strength."

Tori Stratman's report of August 26, 2002 indicates that plaintiff participated in vocational testing on July 26, 2002.  Plaintiff told Stratman he was interested in enrolling in a formalized retraining program, but did not want to have to make a quick decision.  Thus,

-8-

Stratman determined that a vocational rehabilitation plan would be developed for plaintiff to participate in a period of job placement assistance. Said plan would require plaintiff to place five to six job applications per week, follow up on contacts provided to him, and participate in any interviews that were scheduled for him.

Tori Stratman's October 3, 2002 report states that a meeting was to be held with plaintiff in Falls City on August 28, 2002 to discuss the Vocational Rehabilitation Plan and to obtain his signature. Plaintiff was not home at the time of the appointment, so a copy of the Plan was left with his wife. Plaintiff did sign the Plan and mail it back to Stricklett & Associates, who then forwarded it to the Workers' Compensation Court.

The vocational rehabilitation plan developed by the Workers' Compensation Court's rehabilitation specialist (Tr. 141) contemplated plaintiff getting a new job with a new employer. The plan was based on the information previously collected by Tori Stratman, and the following:

> Recently, Mr. Willey contacted this Specialist and stated that he intends on relocating to Lincoln, NE once he becomes financially stable. Therefore additional labor market research has been conducted in Lincoln, NE and the following positions were found to be appropriate for Mr. Willey at the present time: Sales Associate, Light Delivery Driver, Security Guard, Customer Service Representative and Sales Clerk. These positions tend to pay starting wages of $7.50 to $8.00 per hour. If Mr. Willey puts forth good effort with his job search activities but is unsuccessful in securing full-time employment and consistent feedback is received from employers that there was a lack of job openings and/or Mr. Willey did not have the appropriate skills, then a formalized retraining plan may be considered for Mr. Willey in the Lincoln, NE area.

The Vocational Rehabilitation Plan developed for the plaintiff provided him with 90 days of job placement assistance beginning September 16, 2002. Plaintiff was to receive job leads on a regular basis, including leads in his labor market area as well as the Lincoln area. Meetings

would be held with plaintiff biweekly to discuss his progress in his job search activities.  A resume and cover letters would be developed and forwarded to several employers in his labor market area. (Tr. 147).

On September 6, 2002, plaintiff advised Tori Stratman that he was most interested in attending school in the Lincoln area for Land Surveying; once he started receiving some benefits he would be able to begin looking for a home in the Lincoln area.  On September 10, however, the Workers' Compensation Court Rehabilitation Section advised Stratman that plaintiff's case was in litigation and they could not take any further action on the Rehabilitation Plan at that time.

Plaintiff contacted Stratman's office on September 18, 2002 and stated that he was "very interested" in going to Southeast Community College in Milford, Nebraska and exploring the Land Survey Program.  Plaintiff's wife said they would have to have assistance in relocating to Milford if plaintiff was enrolled in college beforehand.  She was advised that the case was in litigation in the Workers' Compensation Court and no action could be taken until the parties made a decision as to whether they agreed to vocational rehabilitation services.  The report concludes:

> At the present time Mr. Willey's Vocational Rehabilitation Plan for job placement assistance cannot be implemented or acted upon by the Workers' Compensation Court because Mr. Willey's case is in litigation.  However, should the parties approve vocational rehabilitation services, ... further career exploration [should] take place in order to assist Mr. Willey in returning to work at a comparable rate of pay to what he was earning at the time of injury should he and his family decide to relocate to Milford, Nebraska....

-10-

Correspondence from Tori Stratman to Exmark's workers' compensation insurance carrier indicates that in December 2002, plaintiff expressed interest in pursuing a real estate appraisal licensure; however, it was not feasible to develop a Vocational Rehabilitation Plan with this goal due to the schedule of required classes.

On February 12, 2003, plaintiff and Stratman met with the program chairs of the Computer Aided Drafting and Design program at Southeast Community College in Lincoln. The next day, plaintiff contacted Stratman and said he was very interested in pursuing an Associate's Degree in Computer Aided Drafting and Design; the entry-level wages paid in the range of $12 to $13 per hour. Although there was a concern regarding the frequent use of a computer mouse, plaintiff stated that he practiced moving a computer mouse around with his left hand for a significant period of time and did not have any difficulty. A Vocational Rehabilitation Plan was developed for plaintiff to obtain an Associate of Applied Science Degree in Computer Aided Drafting and Design at Southeast Community College in Lincoln. The Plan (Tr. 233) was approved by the Workers' Compensation Court Rehabilitation Specialist on February 26, 2003 and forwarded to the plaintiff by letter dated March 14, 2003 (Tr. 227). Plaintiff was scheduled to begin a 2½ year program at Southeast Community College on March 27, 2003, at which time he would begin receiving temporary total disability benefits.

Plaintiff suffered a "boxer's fracture right hand" on or about March 5, 2003 when he became upset at someone and hit a wall instead of the other person. (Tr. 339). Tori Stratman's report of April 2, 2003 notes that plaintiff requested accommodations with his Plan because his right arm was in a cast and he was right hand dominant. He also requested that Stratman submit

-11-

a letter to the Department of Social Services explaining his participation in vocational rehabilitation services.

Plaintiff was enrolled in classes at Southeast Community College and met with the special needs counselor on March 24, 2003. On April 2, plaintiff advised Stratman's office that he needed an algebra tutor, a 20 lb. box of printing paper, and a floppy disk; he had used most of his general supply money. Plaintiff subsequently advised Stratman that the cast had been removed from his right hand and he did not anticipate any problem utilizing his dominant hand in his classes. Plaintiff continued to have problems mastering his algebra class, but there were other students waiting in line for algebra tutoring. Tutoring reimbursement was approved on or before April 17, 2003, and plaintiff was assigned an individual tutor who would work with him for five to seven hours per week.

By April 22, 2003, however, plaintiff advised his vocational counselor that he wanted to consider changing programs. He was no longer interested in Computer Aided Drafting and wanted to check into the Automotive Technology Program. There was a waiting list for that program until the summer of 2004, so Stratman recommended that plaintiff "continue in the Computer Aided Drafting Program as he has not yet even completed one ... quarter of study." Plaintiff received above average grades for his first quarter classes. With Stratman's assistance, plaintiff enrolled in classes for the Summer Session.

In July 2003, plaintiff told Tori Stratman that both Dr. Symonds and Dr. David Clare believed plaintiff's hand muscles were deteriorating. Plaintiff was referred to Dr. Robert R. Sundell, a neurologist. Dr. Sundell noted a "significant hereditary tremor." His report to Dr.

-12-

Symonds states that plaintiff had "slight weakness of right fifth finger abduction and mild atrophy involving the left first dorsal interossei muscle." Otherwise, plaintiff's strength and bulk were "relatively preserved." Dr. Sundell was uncertain as to the cause of plaintiff's symptoms. His July 31, 2003 report concludes:

> On examination he is alert and attentive gentleman in no apparent distress. Speech is fluent. There is no aphasia or dysarthria. Mental status testing is judged to be intact. Fields are full. Discs are sharp. Eye movements are intact. Facial strength and sensation are intact. Hearing is symmetric. Palate and tongue are midline. His neck is supple. He has a somewhat long slender neck but no definite atrophy. Trapezius strength, neck flexors, and sternocleidomastoid strength and bulk are all intact. He has normal deltoids, biceps, and triceps. He seems to have symmetric reasonable good grip. He thinks it is not as good as it should be. I see no atrophy in the forearm musculature. In the hands he has essentially normal interossei strength except for right finger abduction which is mildly weak. There is some at least mild atrophy in the left first interspace. Thumb abduction is strong. I think his thenar eminences are of reasonable bulk. Lower extremity strength testing is normal. Toe extension is strong. Bulk and tone are normal. Reflexes are normoactive and symmetric including ankle jerks. There is just a hint of high arches but nothing severe. There are no Babinski's signs. Sensory examination to cold, light touch, pinprick, and vibration is normal in all four extremities. Gait is stable. He turns well. He has at least a moderate postural tremor.

(Tr. 370-71).

Dr. Clare's July 21, 2003 report incorporates plaintiff's history of surgeries, complaints of numbness and feeling of weakness. "He has been worked up extensively and I am the fourth orthopedist that he has seen. He has also received a comprehensive evaluation by a neurologist in Omaha and has had numerable diagnostic studies performed. He has had an MRI of his C-spine as well as multiple EMG studies." Plaintiff's past medical history was otherwise "unremarkable." He had no known drug allergies and was not taking any medications. Plaintiff's

-13-

surgical incisions were well healed.  He did have the appearance of some thenar and hypothenar atrophy, which was "peculiar."  Sensation was normal to the tips of his fingers, and he had fairly symmetric grip strength. Tinel's and Phalen's were negative.  Plaintiff had good wrist mobility, normal elbow and shoulder motion, and appeared to have "pretty good" upper extremity strength throughout.

Dr. Clare had a long discussion with plaintiff and his wife about these symptoms, and discussed the symptoms with Dr. Symonds.  He recommended further evaluation by a neurologist or rheumatologist.  "I know he had a comprehensive neurologic evaluation that was recently performed and stated to be unremarkable.  I am really not sure what to think of this weakness.  The patient and his wife are convinced that he is much weaker and not able to perform the activities that he had performed previously."

Dr. Sundell examined plaintiff again on August 27, 2003.  He noted that plaintiff's prior medical records included a normal MRI of the cervical spine, a negative EMG and nerve conduction study, and normal B12, folate TSH, and T4 levels.  Dr. Sundell did not observe any weakness of plaintiff's right fifth digit abduction. There was a "trace of decreased bulk involving his left web space as before."  Plaintiff had a significant postural tremor, which the doctor thought was hereditary.  Tests for strength, reflexes, and sensation were all normal.  Following this examination, Dr. Sundell had a long discussion with plaintiff and his wife.  He could not find any neurological explanation for the reported numbness, pain, and plaintiff's perceived weakness.  "Actually I think his grip is relatively good."  The hereditary tremor could interfere with his fine

-14-

motor functioning, and plaintiff could consider medication to control the tremor and for chronic pain, or plaintiff could be seen at a pain center.

On September 9, 2003, Dr. Symonds issued a general letter advising that no specific treatments had improved plaintiff's reported symptoms of pain and weakness. Plaintiff complained that working with a computer keyboard and mouse for several hours a day had become an increasing problem for him, to the point where he was not sure he could continue in that field. Dr. Symonds' letter suggested that plaintiff's current area of interest–religious ministry–would be more appropriate, and requested that the possibility of plaintiff attending a ministerial school be investigated.

In a meeting with Tori Stratman on October 3, 2003, plaintiff, accompanied by his pastor, expressed a "strong interest in a ministerial program" and said he would not be able to continue in the Drafting Program at Southeast Community College due to the weakness in his hands. The pastor advised that plaintiff could obtain a "Bachelor's in Bible" through his local church in Beatrice within two years at a cost of $2,000. Plaintiff would then be trained to become a minister. This proposal was not acceptable to Exmark's workers' compensation insurer, whose attorney suggested that Stratman submit it to the Compensation Court for guidance.

Tori Stratman's December 15, 2003 letter to the workers' compensation insurance carrier states that plaintiff provided information that he would not need a Bachelor's degree to become a minister; he would need to complete 11 hours to become certified and 11 hours to be licensed. To become actually licensed, plaintiff would need to work in the field two years after completing the required courses. Upon becoming licensed, plaintiff would be required to work additional

-15-

time in the field to become an ordained minister with the Assembly of God.  The salary of an ordained minister could range from $0 to $10,000 annually.  Plaintiff, who was still attending classes and had registered for the Winter 2004 quarter, also advised Stratman that he intended to apply for a job with the City of Lincoln.

The job opportunity with the City "fell through" and plaintiff formally withdrew from Southeast Community College.  Thus, in January 2004, Stratman's office decided to develop a Vocational Rehabilitation Plan (*see* Tr. 169-175) for plaintiff to obtain a Certificate in Ministry through Global University located in Springfield, Missouri.  Plaintiff would work independently toward this Certificate with the assistance of his pastor.  To this end, Dr. Symonds offered his opinion that the Computer Aided Drafting and Design program was no longer appropriate due to plaintiff's limitations.  Dr. Symonds opined that plaintiff had significant atrophy, loss of grip strength, and intermittent painful upper extremities.  According to Dr. Symonds, plaintiff would be capable from a physical standpoint of completing a training program to become a Certified Minister.  "He feels he would be good in the ministry so I will give him the benefit of the doubt." (Tr. 158).

Plaintiff submitted his applications for Social Security  disability insurance benefits and supplemental security income benefits on January 9, 2004, and a Disabilities Determination Evaluation was conducted by physical therapist Jake DeNell in March 2004.  (Tr. 378). Plaintiff continued to complain of hand discomfort, explaining that he found it difficult to carry his gun for long periods while hunting, and that he had to change the way he fished (Tr. 379).  Mr. DeNell found that plaintiff had normal upper extremity strength, though he had some weakness

-16-

in wrist flexion (Tr. 379).  Hand dexterity was measured with a "Purdue pegboard test," placing him in the 99th percentile for hand dexterity skills (Tr. 380).  Plaintiff  had few functional limitations, as he could walk normally, squat, reach overhead, reach away from his body without difficulty, and so on (Tr. 380).  Mr. DeNell again concluded plaintiff could perform medium work, but that he might be "susceptible to repetitive motion type activities, but should keep his hands in a neutral position" and should be allowed to take breaks (Tr. 380-81).

A Residual Functional Capacity (RFC) assessment performed in May 2004 (Tr. 292-293) reflects plaintiff's statements that he did some cleaning and vacuuming at home.  He occasionally prepared meals but had difficulty opening jars.  He could use a riding lawn mower for an hour and goes hunting.  He could drive two hours, walk one to three miles, stand for several hours, climb two to three flights of stairs, and sit for one to three hours.  The medical consultant, Dr. Hohensee, also reviewed plaintiff's medical records and concluded:

> The claimant's allegations appear to be only partially credible.  He suggests primary problems with the significant weakness in his hands as well as tingling and numbness, however, multiple different examiners find that his strength is only minimally decreased....  Dr. Bertoni indicated he had 5/5 strength of all and Dr. Sundell indicated that his "strength is preserved."  Also he has had EMG/nerve conduction studies x2 since his surgery and both indicate no evidence of continued neuropathy.  Also the FCE and recent CE exam of March '04 suggest he is capable of medium type work.  Documented severe medical impairment is status post bilateral carpal tunnel release with an essential tremor.  He does not meet or equal the listings and would appear capable of work as noted in the RFC.

(Tr. 292-293).

-17-

Plaintiff's applications for Social Security disability benefits were denied on May 18, 2004 (Tr. 29-33) and, upon reconsideration, on July 26, 2004 (Tr. 35-39).  Plaintiff requested a hearing before the ALJ, and the investigation continued.

Responses to interrogatories completed by plaintiff's wife and parents in July 2004 (Tr. 99-107) were to the effect that the plaintiff had problems with tremors, pain, and swelling in his hands.  He performs minor household chores and participates in religious activities.  He is unable to do things that he could do prior to the surgery and is upset that he can no longer support his family.

On April 8, 2005, Dr. Symonds completed a "residual functional capacity questionnaire" submitted by plaintiff's attorney (Tr. 386).  He wrote that plaintiff had pain and loss of grip strength (Tr. 386).  He added that plaintiff could walk about three blocks, and that he could sit or stand no more than 30 minutes (Tr. 388).  Dr. Symonds believed plaintiff would need to take breaks, and that he would be restricted in lifting, twisting, stooping, crouching, and climbing stairs (Tr. 389-90).  He also wrote that plaintiff would be absent three days per month (Tr. 392).

Plaintiff consulted Dr. Symonds on September 13, 2005, complaining that his forearms were atrophying.  His right forearm was about ½ inch larger in the diameter than the left forearm.  "Certainly nothing to indicate any progressive neuropathic type of disorder."  (Tr. 398).

Plaintiff returned to Dr. Symonds on March 4, 2006 to discuss the possibility of fibromyalgia.  The doctor observed, that plaintiff did have "symptoms compatible with a chronic pain syndrome such as fibromyalgia.  He suffers from insomnia, poor sleep habits in general, poor eating habits, flat affect, and symptoms of depression.  He complains of generalized

achiness and generalized joint discomfort as well." Dr. Symonds prescribed Effexor for a one-month trial and Tylenol and Motrin for pain relief.

In May 2006, Dr. Symonds completed another questionnaire explaining that he had discussed a "possible" fibromyalgia diagnosis with plaintiff as a "possible etiology" for his otherwise unexplained complaints (Tr. 400). He did not diagnose plaintiff with fibromyalgia.

In June 2006, plaintiff provided written responses to interrogatories (Tr. 117-122) stating that he could not work because his entire body ached and he suffered from fatigue, depression and muscle weakness. He described his pain as including "explosive" headaches, and near constant flu-like ache and sharp joint pain and stated he could lift 10 pounds using both hands (Tr. 120). He stated he was taking Effexor, as prescribed by his doctor.

The litigation filed by plaintiff in the Workers' Compensation Court was resolved in a lump sum settlement some time prior to May 2006. (*See* Tr. 124). The parties' application for approval of the settlement incorporates plaintiff's allegations that he refuses to participate in formal vocational rehabilitation, is unemployed, and wants to enter a course in the ministry. He expressly waived any and all rights to vocational rehabilitation under the Nebraska Workers' Compensation Act. He acknowledged receiving disability payments covering 125 non-consecutive weeks between February 28, 2001 through January 25, 2004 from Exmark's insurance carrier of $24,544 for temporary total disability, $2,080 for temporary partial disability, and $21,792 for permanent partial disability. The insurer also paid a total of $19,566 for plaintiff's medical expenses. Plaintiff alleged that he had a 10% permanent partial loss of use and disability of each upper extremity and had no other permanent injuries or disability as a

result of his accident at Exmark.  He was willing to accept the sum of $26,000 for any future expenses which may be incurred by reason of said accident.  Exmark and its insurer contested the extent of plaintiff's injuries, but were willing to settle the matter for an additional final lump sum payment of $26,000.

Plaintiff testified at the hearing on May 24, 2006 that he did not anticipate ever working again due to his increased pain; he might have fibromyalgia.  He attributed his inability to sit or stand for eight hours to "the diagnosis of possible Fibromyalgia" which, he claimed, had been made by Dr. Symonds.[2]  He would consider taking a job "where they'd let me come in when I wanted to, leave when I wanted to and do what I wanted to."  He could not work with his hands due to his tremors, loss of strength and muscle atrophy.  He claimed that his strength had gotten worse since he was last tested.

Plaintiff testified he took medication for depression, but did not take prescription medication for pain.  He would rather deal with the pain than the side effects of medication.  He takes Tylenol about two or three times a week.  He stated that his pain and fatigue had gradually increased over time.

Vocational Expert Steven Kuhn testified that plaintiff could return to his past relevant work as a production welder, cleaner and exterminator based on an assumption or hypothetical that plaintiff

- could occasionally lift or carry 50 pounds,

---

[2]Dr. Symonds specifically reported in May 2006 that he did not diagnose plaintiff with fibromyalgia. (Tr. 400).

-20-

- could frequently lift or carry 25 pounds,
- could stand or walk or sit six hours in an eight hour day,
- could use his arms for occasional pushing or pulling,
- could occasionally use ladders, ropes and scaffolds,
- could do all activities on a frequent basis except for crawling,
- could do crawling occasionally,
- could use his hands frequently for handling, fingering and feeling, and
- could use his hands occasionally for overhead work.

Mr. Kuhn did not see anything in Jake DeNell's reports that would prevent plaintiff from performing those jobs.

Assuming that plaintiff must keep his hands in a "neutral position," plaintiff would have to keep his hands more straight at the wrists versus flex or rotated at the wrists. This requirement would disqualify him from working as a welder; however, he could still work as an exterminator or cleaner, consistent with the information contained in the CFE prepared by Jake DeNell in August 2001. If one accepted plaintiff's testimony as true, or Dr. Symonds' conclusions to be valid, plaintiff would be precluded from all employment.

## III. LEGAL ANALYSIS

### A.  Standard of Review

The ALJ found that the plaintiff was not entitled to disability benefits because he is not "disabled" under sections 216(i), 223(d) or 1614(a)(3)(A) of the Social Security Act. This decision, which stands as the final decision of the Commissioner, must be affirmed if it is supported by substantial evidence in the record as a whole. *Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" *Id*. (quoting *Young v. Apfel*, 221

F.3d 1065, 1068 (8th Cir. 2000)).  The court must consider the entire record, including evidence

that supports as well as detracts from the Commissioner's decision.  The court cannot reverse the

Commissioner's decision simply because some evidence may support the opposite conclusion.

*Id.  See also Robson v. Astrue*, — F.3d —— , No. 07-1863, 2008 WL 2117155 (8th Cir., May

21, 2008); *McEvers v. Astrue*, 518 F. Supp. 2d 1071 (S.D. Iowa 2007).

### B.  Errors Alleged

Plaintiff contends the ALJ's decision is not supported by substantial evidence because the

ALJ

(1)  failed to consider third party information and observations submitted by plaintiff's wife and parents;

(2)  failed to follow the *Polaski*[3] guidelines in making a credibility determination;

(3)  did not assign or erroneously assigned weight to medical opinions of record; and

(4)  erroneously formulated the plaintiff's residual functional capacity (RFC).

### C.  Discussion

Under the Social Security Act, the term "disability" is defined as the "inability to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d).  Further,

(A)  An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not

---

[3]*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

(B)  In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.  If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

42 U.S.C. 423(d)(2)

In deciding whether a claimant is disabled, the ALJ must follow a five-step sequential evaluation process, considering:  (1) the claimant's work activity, if any; (2) the medical severity of the impairment; (3) whether the medical severity of the impairment equals one of the listings in Appendix 1 of Chapter III, Part 404, Subpart P[4]; (4) the claimant's residual functional capacity (RFC) and past relevant work; and (5) whether the claimant can perform other jobs in the economy given the claimant's RFC, age, education, and work experience.  *See Robson v. Astrue*, No. 07-1863, 2008 WL 2117155 (8th Cir., May 21, 2008).

---

[4]20 C.F.R. Pt. 404, Subpt. P, App. 1

-23-

The court finds that the ALJ followed the sequential evaluation process set out in 20 C.F.R. §§ 404.1520[5] and 416.920 to determine whether the plaintiff was disabled.

**Step 1** – The ALJ found that the plaintiff had not engaged in substantial gainful activity since February 2, 2001, the alleged date of onset.  This finding is not contested.

**Step 2** – The ALJ found that the plaintiff had impairments that were considered to be "severe" under the applicable regulations (i.e., the residuals of bilateral carpal tunnel release surgery and an essential tremor in his hands).

---

[5]20 C.F.R. § 404.1520(a) provides:

**(4) The five-step sequential evaluation process.**  The sequential evaluation process is a series of five "steps" that we follow in a set order.  If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step.  If we cannot find that you are disabled or not disabled at a step, we go on to the next step.  Before we go from step three to step four, we assess your residual functional capacity....  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.  These are the five steps we follow:

(i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.... (See paragraph (b) of this section.)

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.  (See paragraph (c) of this section.)

(iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.  (See paragraph (d) of this section.)

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.  (See paragraph (f) of this section and § 404.1560(b).)

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.  (See paragraph (g) of this section and § 404.1560(c).)

The provisions of 20 C.F.R. § 920(a)(4) are virtually identical to those of § 404.1520(a) .

***Steps 3*** – The ALJ found that the plaintiff's impairments were not so severe as to constitute a listed impairment under Appendix 1, and the plaintiff did not have a combination of impairments that met or medically equaled one of the listed impairments in Appendix 1. Accordingly, the ALJ evaluated plaintiff's residual functional capacity (RFC) in accordance with 20 C.F.R. § 404.1545 and found that plaintiff

> has the residual functional capacity to occasionally lift up to 50 pounds and to frequently lift up to 25 pounds. He retains the ability to be on his feet (either standing or walking) for at least six hours out of eight hours and he is able to sit for at least six hours a day. The claimant can use his upper extremities for no more than occasional pushing.  He can crawl and climb ladders, ropes, and scaffolds only occasionally. He is limited to using his hands for overhead work only occasionally. He can use his hands and fingers for frequent handling, fingering, fine manipulation, and feeling.

(Tr. at 18).

RFC is defined as what the claimant "can still do despite . . . limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a).  RFC is an assessment based on all "relevant evidence," *id.*, including observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of his limitations.  *Id.* §§ 404.1545(a)-(c), 416.945(a)-(c).  *McKinney v. Apfel*, 228 F.3d 860, 863-64 (8th Cir. 2000).  An ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate.  *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001).  Both physical and mental limitations must be considered.

> A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).   In assessing the credibility of a claimant's subjective pain complaints, an ALJ is to consider

-25-

>factors including the claimant's prior work record; the claimant's daily activities; observations of the claimant by third parties and treating and examining physicians; the duration, frequency, and intensity of the claimant's pain; precipitating and aggravating factors; the dosage, effectiveness, and side effects of the claimant's medication; treatment, other than medication, for relief of the claimant's pain; and functional restrictions on the claimant's activities. *See id.* Although "an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002) (internal citation omitted); *see also Goodale v. Halter*, 257 F.3d 771, 774 (8th Cir. 2001) (noting that an ALJ may discount subjective complaints if there are inconsistencies in the evidence as a whole), *cert. denied*, 535 U.S. 908 (2002).

*Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006) (parallel citation omitted).

In reaching her decision, the ALJ found that the plaintiff's allegations regarding the extent of his limitations were not totally credible. Prior to rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination explaining why he or she does not fully credit the claimant's complaints. *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). An ALJ's findings on credibility are crucial to the proceeding because they affect the determination of RFC and the formulation of any hypothetical presented to the vocational expert, as a hypothetical question need only include the impairments and limitations found credible by the ALJ. *See Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005), *Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004). The court "'will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain.'" *Id. See also Howe v. Astrue*, 499 F.3d 835, 841 (8th Cir. 2007).

-26-

In this instance, the ALJ properly considered the inconsistencies between the objective medical evidence and plaintiff's complaints of pain. Although the plaintiff complained that severe pain prevents him from working, he did not seek any medical treatment (such as medication) to control or moderate pain. He said that he disliked taking pain medication because of side effects; however, none of his medical records show that he ever tried any pain medication or suffered any side effects from taking pain medication. In May of 2002, plaintiff's neurologist wrote that the plaintiff was "not interested in taking any pain medications at all." It seemed unlikely to the ALJ that a person who, shortly before the hearing, complained of "explosive" headaches as well as pain in his neck, shoulders, elbows, wrists, hands, lower back and knee would endure such widespread pain without making extraordinary attempts to get medical treatment to reduce it.

Plaintiff also provided inconsistent information about his tremors. During the May 24, 2006 hearing, the plaintiff testified his hand tremor did not begin until after the surgeries in 2001; however, in 2002, he told Dr. Bertoni the tremors had been present for at least five years. Plaintiff testified that the tremors prevented him from using a computer mouse; however, he scored in the 99th percentile on a test of manual dexterity administered in March 2004 and had advised his vocational rehabilitation counselor that he did not anticipate any difficulties in using his dominant hand in his college courses.

Finally, the plaintiff alleged in his application for approval of the lump sum settlement in the Workers' Compensation Court that he refused to participate in formal vocational rehabilitation. This admission, together with his testimony that (although he was only 39 years

old) he did not expect to ever return to work, "tends to cast doubt on the claimant's desire and motivation to work again."

The ALJ's decision does not specifically discuss the questionnaires completed by plaintiff's wife and parents in July 2004. While it would have been preferable for the ALJ to address the statements specifically, her failure to do so is not dispositive. The statements of these witnesses were brief and non-detailed, and echoed plaintiff's own complaints of hand pain, which the ALJ considered and discussed.

The court further finds that the ALJ properly accorded little weight to the RFC questionnaire prepared by Dr. Symonds on April 8, 2005, reflecting "severe and pervasive limitations that, if present, would be incompatible with all sustained work activity." A treating physician's opinion is not inherently entitled to controlling weight. *See Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007).

> "A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, ***provided*** the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." ... The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight.... "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." ... Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement....

*Hamilton v. Astrue*, 518 F.3d at 610 (emphasis added; citations omitted).

-28-

This record demonstrates a pattern of plaintiff consulting Dr. Symonds complaining of pain.  Dr. Symonds, in turn, referred plaintiff to neurologists, orthopedists, physical therapists, and other specialists.  Over the years, none of the specialists detected any significant loss of strength or dexterity in the plaintiff.  They remained unsure of the etiology of plaintiff's complaints of numbness, pain, and plaintiff's perceived weakness.  Although the plaintiff speculated that he may suffer from fibromyalgia, no doctor has ever made that diagnosis.  The ALJ correctly noted that Dr. Symonds never recorded any observations or clinical findings supporting the assertion that the plaintiff had difficulty with walking, standing or sitting.  Thus, it appears that the severe limitations described by Dr. Symonds on April 8, 2005 (Tr. 385-392) and reaffirmed on April 16, 2006 (Tr. 393) are based largely, and possibly solely, on plaintiff's subjective complaints.  Dr. Symonds' conclusions as to the magnitude of plaintiff's limitations are in substantial conflict with all other medical evidence of record.  The RFC determined by the ALJ, however, falls within the parameters of objective medical evidence and takes into account the plaintiff's legitimately documented limitations.

Considering the record as a whole, the court finds that the ALJ's assignment of weight to medical opinions, credibility determinations, and RFC assessment are all supported by substantial evidence.

*Steps 4 & 5* – The ALJ found that the plaintiff was capable of performing his past relevant work as an exterminator and cleaner, and is able to perform it as generally performed, as those occupations do not require a functional capacity exceeding that of the plaintiff.  Even with plaintiff's restrictions, an individual would be able to perform about 65% of the unskilled,

-29-

light jobs in the national economy.  An individual such as the plaintiff could also perform the jobs of assembler and cafeteria cashier.

The court finds that the ALJ's determinations that plaintiff can perform other jobs in the economy, given his RFC, age, education, and work experience, are supported by substantial evidence in the record.

### IV.  CONCLUSION

The plaintiff was given a fair hearing and full administrative consideration in accordance with applicable statutes and regulations. For the reasons discussed above, the court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed.  Accordingly,

**IT IS ORDERED** that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

**DATED May 28, 2008.**

> **BY THE COURT:**
>
> **s/ F.A. Gossett**
> **United States Magistrate Judge**

-30-